9 N.J. Super. 401 (1950)
74 A.2d 914
RKO THEATRES, INC., ET AL., PLAINTIFFS,
v.
TRENTON-NEW BRUNSWICK THEATRES CO., ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 26, 1950.
*403 Mr. Joel Gross for the plaintiffs.
Mr. James D. Carpenter, Mr. Samuel M. Coombs, Jr., and Mr. Milton A. Dauber for the defendants (Messrs. Carpenter, Gilmour & Dwyer, attorneys).
JAYNE, J.S.C.
The plaintiffs, owners of one-half of the voting shares of the capital stock, seek in this proceeding to attain the dissolution of the defendant Trenton-New Brunswick Theatres Company, a corporation of the State of New Jersey, pursuant to the terms and provisions of R.S. 14:13-15, N.J.S.A. A narrative of many of the circumstances and events which have occasioned this action may be found in a memorandum previously filed and reported in 8 N.J. Super. 404, 72 A.2d 914 (Ch. Div. 1950), and to which in the avoidance of repetition I particularly refer.
Then, too, by reason of the publication of the recent decisions in Post-Standard Co. v. Evening Journal Ass'n., 1 N.J. 437, 64 A.2d 80 (1949), and In re Collins-Doan Co., 3 N.J. 382, 70 A.2d 159 (1949), an exposition of the statute would also be redundant and superfluous.
It is understood that the statute confers upon the Chancery Division of this court judicial power to be exercised within the jurisdiction bestowed, in accordance with the normal procedure and customary processes of a court of equity.
Conscientious disagreements with respect to corporate business management and policy are more or less inevitable and ordinarily reconcilable. They are wisely subordinated to the superior concern for the general welfare of the enterprise. Unity of action necessarily depreciates proportionately with *404 the rise of discord. Questions of the business and economic policy of a corporation are to be determined by the directors, and the court intervenes in the internal affairs with reluctance. Laredef Corp. v. Federal Seaboard Terra Cotta Corp., 131 N.J. Eq. 368, 25 A.2d 433 (Ch. 1942); Federal Terra Cotta Co. v. Atlantic Terra Cotta Co., 133 N.J. Eq. 360, 32 A.2d 331 (Ch. 1943).
But, "In fine, where dissension among the shareholders of a corporation is such as to work a paralysis of corporate function, the sovereign power whence the franchise came has an interest that will sustain its intervention for the dissolution and liquidation of the corporation. And it may intervene, too, for the protection of shareholders. Certainly, dissolution was within the contemplation of the shareholders here if differences arose which could not be composed. This is the principle of the statutory provision invoked here. The act is designed to operate where there is `a stalemate in corporate management.' In re Evening Journal Association, 1 N.J. 437 (1948). The power proceeds from the same source and has the same quality as that exerted against insolvent corporations and those in default in the payment of the franchise tax. The act itself suggests the legislature deemed the subject matter of public concern." In re Collins-Doan Co., supra (at p. 395).
The mutuality of stock ownership in this corporation between the RKO and the Reade interests seems to have been born in an environment of resentment. I will have you listen to excerpts from the testimony of Mr. Walter Reade, Sr.
"Q. When did the plaintiff here, the RKO Theatres, or its predecessor in title, first get an interest in these theatres?
"A. I don't remember the exact date. The records would show. It was about five, six or seven years after I had operated these units for Mr. Storrs and myself."

* * * * * * * *
"A. Mr. Albee, who was then the president or in control of the B.F. Keith Company, sent for my associate, Frank Storrs, who had refinanced me out of these properties, and he threatened Mr. Storrs that, if he did not give him 50 percent of the operation of these leaseholds, *405 which I had with Mr. Storrs. that he would bill no theatres in the cities of New Brunswick and Trenton. He went so far as to purchase a piece of ground adjoining the Stacy-Trent Hotel, on State Street, in Trenton."

* * * * * * * *
"Q. After this conversation with Mr. Albee in New York to which you have referred, what did you do?
"A. We went out on the street and tried to buy vaudeville acts which were not controlled by that corporation at that time. They had a franchise covering the entire acts of the B.F. Keith booking office, which was the only vaudeville booking office in America where one could obtain acts, and if acts worked for anybody else other than through that office or one of their agents, they were blackballed and they were not given any work. So we struggled along three or four weeks and Mr. Storrs told me that he had hundreds of thousands of dollars invested in there and he would rather have 50 percent of a good thing than 100 percent of something that was going to cause him a lot of financial loss, and we would have to stand for the blackmail and give it up."

* * * * * * * *
"A. With the original acquisition of the Taylor Opera House, located at State and Broad Streets, and the Trent Theatre, and the Palace Theatre in this city, even after we had given Mr. Albee 50 percent of the stock, Mr. Albee permitted me, or allowed me, or told me, to continue to manage these properties. From that time on the City of Trenton grew. * * *
"I purchased various other properties, including where the South Broad Theatre is. I leased the State Theatre. I bought the stock of the defunct Lincoln Theatre. We built the Hamilton Township Theatre. We built the theatre out on the outskirts, opposite the ball park, and leased the State Theatre in this particular city. This was all done with my efforts, my energy and my money, and I turned it into this company. We went from here to the City of New Brunswick and built another beautiful theatre called the State Theatre. I then acquired the Rivoli Theatre. And I want you to understand, Mr. Carpenter, each time these commercial transactions took place, I bought them with my money. The corporation gave me my money back after they found out they would be successful. They let me keep them about four months and test them out. Then we built the Albany Theatre in New Brunswick. Then we bought, at a ridiculously low figure  at least, I bought it  the Highland Park Theatre, in Highland Park, New Brunswick. During all of this period, Mr. Carpenter, I was the manager and operator and kept the books. The company was in commercial difficulties, financially, throughout a period of years."

* * * * * * * *
"A. I am talking about the RKO, who had absorbed the stock we had given Mr. Albee without the payment of any money whatever. *406 It was taken in by Mr. Joe Kennedy, the then Ambassador to England.
"Q. RKO was.
"A. RKO was. He formed and consolidated what is now known as the Radio-Keith-Orpheum. The stock wasn't worth a penny a share. Mr. Kennedy floated it up to about fifteen or eighteen dollars, sold it to the public, took a walk, and went back to Bangor, Maine, and left it in the hands of incompetent management. I had been in the tough job previous to that of manager of the company. I was getting $50 a week for handling these thirteen units. Mr. Kennedy discharged me, and the moment he left I was sent for and re-hired. This time I went back to work for $200 a week. I revived the assets of the company from the bankruptcy. They were about to be dispossessed by the Trenton Theatre Building Company. That is Mr. Storrs' company, which owns these fees. I got Mr. Storrs to advance me sufficient money to buy the stock of the Lincoln Theatre, to acquire the Rivoli Theatre, and we put the company back in order. From that time on, under my management, the company made from 200 to 300 thousand dollars a year, from a bankrupt company about to be dispossessed by the owner."

* * * * * * * *
"A. * * * If I were a shoemaker or a clothing manufacturer, but having been in this business all of my life, when the company would have meetings, the meetings were so obnoxious and nauseous to me as a man familiar with this industry, with the allocation of productions, being that the voting trust was there in the office, they would buy pictures at a price beyond what we were buying them for. I want to call your attention to the fact that I was operating, in addition to this Trenton-New Brunswick Theatres Company, forty additional theatres. I knew these prices probably better than they did, and we bought them for less. We have records to show that the terms and prices and conditions were less than the Trenton-New Brunswick Theatres Company was paying; and each time I would protest about that particular phase of this business, Mr. Kingsberg would rear back and say, `Do what you Goddam please.'"

* * * * * * * *
"Q. Mr. Reade, may I ask whether as a result of your disagreement with the price at which RKO was booking pictures and charging them to this company you did not start a suit in New York to have that provision of the charter held illegal?
"A. I did, and I was successful."

* * * * * * * *
"Q. And the voting trust agreement, P. 1, was in effect from the date of its execution until the date in 1943 when you signed P. 4.
"A. Yes, sir.
"Q. Without objection from you.
"A. There was objection from me but I did not get anywhere.
"Q. You did not object.
"A. Oh, yes, I objected.
*407 "Q. Wait, Mr. Reade. You did not object on the score that you had been blackmailed into signing the agreement, did you?
"A. I must have squawked every year of my life that he shook me down for this 50 percent of this stock.
"Q. But you took no proceedings during that entire interval.
"A. My associate would not let me.
"Q. Mr. Storrs was dead.
"A. No. He was alive.
"Q. He is dead now.
"A. He is dead now, yes, sir."

* * * * * * * *
"Q. And from 1931 on, did you have trouble?
"A. Nothing but trouble.

* * * * * * * *
"Q. And with the RKO members of the board.
"A. They had a new member of the board every Friday. They had a new general manager every Monday. They had during that regime of 1931 to 1943 about fifty executives by name. If you would give me time I will tell them to you."

* * * * * * * *
"A. * * * They were just dullards. They knew nothing about the enterprise I was vitally interested in, that I had a large, sixty to seventy-five thousand dollar per annum income from that I didn't want to have spoiled, that I tried to protect. And those bums they had to operate  and I am referring to them as bums because they never came to these towns. They didn't know anything about that.
"Q. You had great difficulty during those years persuading them to adopt your suggestions.
"A. I went before Judge Bondy and he told me to write them a letter. I said, `By the time I write him a letter, he won't be there.'"

* * * * * * * *
"A. * * * Nobody ever agreed to anything I proposed, and it was my business."

* * * * * * * *
"Q. But your trouble started when Mr. Kingsberg affiliated with the RKO.
"A. No trouble started with him until he started to milk the company for the benefit of the parent company."
The foregoing selections vividly portray the emotions of Mr. Reade and the depth of the dissension. Disunion is mostly irreparable when it occurs between a strong will and a strong won't.
Reade is the embodiment of self-reliance, which is the egotism of the man who succeeds. To him disputation is a festival. He was heard to say, "I am a rather litigious type of *408 person. When you grow from where I came, you are bound to meet a lot of stingers."
Hostilities have been manifested by many instances of vigorously contested litigations. In 1928 RKO instituted an action against Reade in New York. In 1929 Reade filed a bill in the former Court of Chancery of New Jersey against the defendant Trenton-New Brunswick Theatres Company. In 1930 Reade commenced an action in the Supreme Court of New York against Radio-Keith-Orpheum Company.
It is evident that it was eventually conjectured that a management agreement entered into under date of September 1, 1942, might alleviate the uncomfortable relationship between the discordant interests, or at least anesthetize the infelicity. Alas! In 1945 Reade (Long Park, Inc.) initiated an action in the Supreme Court of New York to invalidate and nullify the management agreement. The Supreme Court dismissed the complaint. 188 Misc. 793, 66 N.Y.S.2d 165. Its judgment was affirmed in the Appellate Division by a divided court. 272 App. Div. 902, 71 N.Y.S.2d 369. The Court of Appeals on January 16, 1948, reversed the Appellate Division with directions to enter a judgment declaring the agreement to be illegal, void, and unenforceable. 297 N.Y. 174, 77 N.E.2d 633.
There was a period during which the plaintiff offered to sell its stock for $1,500,000 or buy the Reade holding for that figure. It proved to be a pathological belief in the occurrence of the impossible.
The next event of major significance was the entry of the decree in the anti-trust action in the United States District Court for the Southern District of New York, in which the present plaintiff RKO Theatres is enjoined from continuing to exercise joint control in conjunction with independent interests in the theatres conducted by the Trenton-New Brunswick Theatres Co. To accomplish the mandate of the court, the decree makes available to the plaintiff certain permissible avenues of action, such as the acquisition of the interests of the co-owners, or the institution of proceedings for the dissolution *409 of the corporation (to which the plaintiff has chosen to resort), or otherwise relinquishing the objectionable control conformably with the objects of the decree.
Another matter of superior gravity is the amended certificate of incorporation of the company which (section 3) provides that "if any stockholder shall desire to sell all or any part of his stock in the Corporation, he shall first offer to sell the same to the other stockholders of the Corporation and to the Corporation itself at its Book Value * * *."
The plaintiff is between the hammer and the anvil. There is a substantial margin between the book value and the market value of the stock. The frowns of fortune, however, have in the present situation only broadened the disjunction between the rival and contentious interests.
In this proceeding I regard the pressure of the anti-trust decree and the charter restrictions upon the transfer of stock as grave elements in considering the substantiality of the reasons for the deadlock, and I can neither demolish the anti-trust decree nor the restrictive provisions of the charter. Succinctly defined, a deadlocked corporation is one which, because of decision or indecision of stockholders, cannot perform its corporate powers.
In the existing posture of the pleadings and proofs, I must resolve that all of the prerequisites of the statute have been established. A failure of management has arisen within the terms of the statute. Moreover the plaintiff, the present owner of one-half of the capital stock, is inhibited from longer engaging in the management of the corporate affairs even though its representatives were to be tractable. In such circumstances I think I am not privileged to accord decisive weight and pivotal influence to the defensive averments that the plaintiff is actuated by mala fides in the prosecution of this proceeding. Indeed, Mr. Walter Reade, Jr., one of the directors chosen by the defending faction, testified with becoming frankness that "I always voted for the benefit of Long Park." Who, one wonders, has acted primarily for the welfare of Trenton-New Brunswick Theatres Company?
*410 If the plaintiff's pursuit of the remedial terms of the statute is to be characterized, it would seem rather to exemplify the permissive choice of a drastic expedient. Magnanimity and self-abnegation seldom visited the household of this corporation. I agree that the discord that has imperiled the company is lamentable. From the point of view of the public interest, the incapacity of the corporation to function transcends in importance the suspicions, apprehensions, and animosities which divide and motivate the stockholders. Regardless of the cause, this company at the moment is an armless corporation. Inability to work necessitates retirement.
The theatres have been operated pendente lite by a committee appointed by the court. Such a program cannot longer continue. If this corporation is unable to function in the manner ordained by law, public policy as exhibited by the statute requires its dissolution.
Hope never deserts, but unless some harmonious solution is effectively formulated within fifteen days after the filing of this opinion, a judgment containing appropriate provisions for the dissolution of the corporation will be entered.